**Ricky A. HENDRIXSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–84–030–CR.**

Court of Appeals of Texas,
Beaumont.

Aug. 30, 1984.

Steve Carlton, Orange, for appellant.

David Bosserman, Orange, for appellee.

OPINION

BROOKSHIRE, Justice.

Appeal from an adult revocation hearing. The Appellant, at a prior time, had entered a plea of guilty to driving while intoxicated for which he received a one year probated sentence.

The prior offense arose on or about the 23rd day of January, 1983. When the guilty plea was taken, a hearing was conducted with proper stipulations and waiver of rights. No attack or challenge is levelled against the judgment of March 21, 1983 (the date of the prior hearing), or the terms and conditions of the probation order. The Appellant, being the probationer,

acknowledged a receipt of the "conditions of probation".

On August 29, 1983, a motion to revoke probation was filed in which the assistant county attorney alleged to the court that the Appellant had violated condition (a) in that on or about July 3, 1983, in Orange County, Texas, he did unlawfully, while intoxicated, drive and operate a motor vehicle upon a public highway in Orange County; and that condition (k) had been violated in that the probationer-Appellant was currently $45.00 delinquent in his probation fee payments.

The State's motion to revoke the probation alleged the committing of a subsequent driving while intoxicated offense *and the failure to pay the appropriate fees for probation service.* The Appellant-probationer *defended on the basis that the later D.W.I. allegation was not true.*

After notice, the Appellant appeared with his counsel for a hearing on the motion to revoke. The County Court at Law of Orange County, after hearing five live witnesses, revoked the probation.

At the threshold we are met with this stipulation:

"Defendant is the same Defendant who was placed on probation on March 21, 1983, in Cause No. 40,431 in Orange County, Texas, for the offense of driving while intoxicated. Defendant was informed of the terms of the conditions of probation and the consequences of violating that probation before pleading guilty. Defendant was given a copy of the Terms and Conditions of Probation in open Court and Defendant, on August 26, 1983, was $45.00 delinquent on his probationary fee.

"THE COURT: Is that the stipulation, Mr. Carlton?

"MR. CARLTON: That's correct, Your Honor.

"THE COURT: Very well, I will accept the stipulation as dictated into the record. You may proceed.

"MR. BOSSERMAN: The State at this time moves that the Court take judicial knowledge of all papers on file in Cause No. 40,431.

"THE COURT: Counsel?

"MR. CARLTON: No objection, Your Honor.

"THE COURT: So taken."

Although the Appellant-probationer testified himself and put on one witness, one Lisa Welch, we find nothing in their testimony that would explain away or exonerate or be in the nature of a valid defense to the delinquency in paying the $45.00 probationary fee.

The verbal evidence, or testimony, is set out in the statement of facts, being approximately 113 pages long. The State called Mr. Ronnie Fikes and Mr. Corwin Schalchlin. Each was identified as a trooper or officer with the State Department of Public Safety. Trooper Schalchlin was the first witness. He testified he had been with the Department of Public Safety approximately a year and a half. In brief summary, his testimony was that looking ahead he saw a vehicle traveling; it ran off the road, came back on the road and crossed over the center stripe, then came back into "his lane"; that he was behind the wavering vehicle about 40 yards or so; that it happened on a public road in Orange County; that he saw the driver of that vehicle in the courtroom and identified him as the Appellant.

The first witness further testified that he observed the Appellant's vehicle drop off the road into the grass and, pulling in behind him, he activated his overhead lights and stopped the vehicle. He testified that the Appellant stumbled and put his hand on his car for support, while walking to the back of his own vehicle; that the Appellant took out his billfold and looked through it a couple of times and finally pulled his driver's license out; that he smelled a strong odor of alcoholic beverage on the Appellant's breath; that the officer could smell it from an arm's-length distance; that the Appellant's speech was slurred and he kind of mumbled; that his eyes were very red and bloodshot; Appellant was unsteady on his feet; Appellant

"kinda swayed back and forth"; Appellant was "kind of uncoordinated"; that the Appellant did not appear to be hurt in any way; that his dress was "well in order"; that Appellant was cooperative. This officer testified that he had made approximately 5 to 10 arrests for driving while intoxicated per week during his previous experience; that he could form an opinion from his previous experience and from what he actually observed on the occasion in question, in his opinion, the Appellant was intoxicated and that the Appellant was not able to safely operate his vehicle at that time.

This first officer was expertly and carefully cross-examined by Appellant's counsel. Upon cross-examination, it was established that this officer, as well as perhaps other D.P.S. officers, did regularly patrol the area of the Longhorn Club at approximately the time of this arrest which was alleged to be about 1:50 A.M. in the morning of a Sunday. It would, of course, overextend and make too lengthy this opinion if we detailed all the direct evidence and cross-examination of each witness. We believe it is a fair summation to say that the first officer's testimony, under aggressive and artful cross-examination, stood up as to the testimony concerning the intoxicated condition of the Appellant.

The second witness was Mr. Ronnie Glenn Fikes, employed by the Texas Department of Public Safety, Highway Patrol Service. His employment had lasted five and a half years. He recalled an incident on July 3, 1983, at approximately 1:58 A.M. when he and his partner observed a vehicle being driven in what Fikes considered to be an erratic manner. Patrolman Fikes testified that the erratic manner was weaving on the roadway and crossing over the center stripe. The driver of this erratic vehicle was identified as the Appellant. Fikes testified that he got out on the right side of his patrol car backing up his partner, whom he described as "the lead trooper". The "lead trooper" does the contacts and the talking to the individuals Fikes said. Patrolman Fikes observed the Appellant as he exited his (Appellant's) vehicle and describ-

ed the Appellant as being unsteady on his feet. He testified that the Appellant acted in an unusual way after placed in the patrol unit, in that he noticed some unusual mood changes and the Appellant was crying at times. We note in the record:

"Okay, how was he acting?

"Extreme mood changes, what I consider extreme mood changes. He would cry and then stop."

In the patrol unit, this second witness testified that he did smell an odor of alcoholic beverage on the Appellant. He considered this odor to be strong. At the jail, he described the Appellant as being unsteady and unsure of his steps but the Appellant did not appear to be hurt. The Appellant's eyes, at the jail, appeared to be tired or weak. He listed the Appellant as cooperative. This second patrolman testified that, based on his previous experience and what he had observed, the Appellant was intoxicated. In his opinion, Appellant was not able to safely operate a vehicle. This second officer was carefully and conscientiously cross-examined. For a second time, it was demonstrated that the D.P.S. in Orange County had patrolled in the area of the Texas Longhorn assiduously during the previous 12 months. In the record:

"Q D.P.S. in Orange County has picked up in excess of a hundred by the Texas Longhorn in the last year.

"A That's great.

"Q True or not?

"A It's probably true.

"Q And you are telling me despite that and despite that history and despite the way the D.P.S. has been patrolling that area at that time of the morning on the weekends or whatever day of the week, that everyone of those has to commit a traffic violation before you stop them?

"A Yes, sir. It's unconstitutional to stop somebody for nothing.

"Q Have you ever known an officer to do anything unconstitutional?

"A I should hope not. I have heard of some officers that are—

"Q Sure, some officers are overzealous and do things they shouldn't.

"A There's good and bad in every organization."

On redirect, this officer voiced an opinion that it was good law enforcement to be where the criminals are or where probable or possible criminal or unlawful activity takes place.

The salient feature about Ricky Allen Hendrixson's testimony was that he definitely remembered Officer Schalchlin, but he testified that Officer Fikes was not at the scene the night of the arrest. Appellant stated, under oath, that he had a maximum of 3 beers at the Longhorn, between 11:30 and quarter of 2:00. He did admit bursting into tears once:

"Q By the way, were you crying and all that in the car?

"A I did burst into tears once, yes, because I thought, well this, you know, goes my license; I am ruined.

"Q You knew you were on probation?

"A Well, I had my own company and I was trying to make good of it and I was very upset."

Appellant further testified:

"Q There's no doubt in your mind where you were stopped and there's no doubt in your mind that this other officer wasn't even there?

"A I have never been that drunk in my life, sir, never.

"THE COURT: I don't believe you answered the man's question.

"MR. CARLTON:

"Q No, I am asking about that Fikes wasn't there, this guy that you just saw?

"A I am a hundred percent positive."

In a previous part of his testimony, the Appellant testified as follows:

"Q Was that the police?

"A Yes, I managed to make out the lights on top while they shined the Q-Beam on my car, that's why I stopped.

"Q The same two officers who testified here today?

"A No. Fikes, this is the first time I have ever laid eyes on him in my life.

"Q Was the first officer there?

"A Yes, sure was.

"Q This other officer that just testified, you have never seen him before?

"A I have never laid eyes on him.

"Q Was there another officer?

"A Yes, there was, Officer Green."

On cross-examination, the Appellant testified:

"BY MR. BOSSERMAN:

"Q How do you know Officer Green?

"A I have just heard of him. I have just seen him.

"Q Okay. He didn't stop you on the original D.W.I., the one you were placed on probation for?

"A I can't remember the guy's name. I am not really sure on that. I don't know the guy's name.

"Q But you don't know Green?

"A No personally. I know what he looks like. Personally I don't know him, no.

"Q Have you ever had any dealings with Officer Green?

"A No.

"Q You have had no dealings with him. Now, who are the two officers that you said were in that car? Were there two or three officers in the car that stopped you?

"A I saw two officers in the car that stopped me.

"Q Okay, and it was Officer Green and Officer Schalchlin, is that what you testified to?

"A Yes.

"Q How well do you know Officer Schalchlin?

"A The first time I have ever seen him was that night.

"Q You had never seen either one of these officers before, is that what you are saying?

"A I have seen Schalchlin, is that his name?

"Q Schalchlin.

"A I seen him the night that he stopped me. That's the first time I had ever seen him.

"Q Okay, but what I am saying is that before you were stopped, you hadn't seen either one of these officers before? You had heard of them—

"A I had seen Green before, yes, sir.

"Q Okay, but you didn't know him very well?

"A I didn't know him personally, no sir.

"Q Had you had any contact with him?

. "A No, no contact.

"Q So, before this date of arrest, you had no contact with either Green or Schalchlin, is that right?

"A Not Schalchlin, but I couldn't be sure who gave me my first D.W.I. I don't know. I just never—

"Q You don't remember if it was Green or not who gave you the first D.W.I.?

"A No, I just remember it was a smaller, whole lot smaller man.

"Q But it wasn't Green?

"A That's something I couldn't be sure about. I don't know. I know him when I see him now, but—

"Q Okay, you are testifying it was Green who stopped you this last time, but you testified you don't remember who stopped you on the first D.W.I.?

"A If I had the ticket I could tell you, but I don't have the ticket. I don't know where it is.

"Q Look, you have just testified that Officer Green was one of the officers who stopped you this last time, right?

"A Last time, yes, sir."

The State called to the stand Corwin Schalchlin as a rebuttal witness. He reaffirmed that Trooper Fikes was with him when he made the stop and arrest of the Appellant and that Officer Green was not with him at the time. Officer Schalchlin testified that there was no possibility that he could be confusing this incident with the one in which his partner was Officer Green.

He further said that his arrest ticket was completed by Trooper Fikes when *both of them got to the jail.* Because of the hotly contested issue as to whether Officer Fikes was at the scene of the stop or scene of the arrest, we find that the careful trial court was concerned to the extent of reading this into the record:

"THE COURT: I am going to have a transcript made of your testimony and I am going to refer that to the District Attorney's office to explore whether either you or him should be prosecuted for perjury, all right? You all understand what I am doing. That is not passing judgment on it one way or the other.

"THE DEFENDANT: Yes, sir.

"THE COURT: But one or the other of you is lying on this witness stand and I am going to give the D.A.'s office a chance to figure that out.

"(HEARING CONCLUDED)"

Prior to the court making the statement about having a transcript of the Appellant's testimony referred to the district attorney's office, the court did state into the record that he found by a preponderance of the evidence that the defendant was, in fact, driving while intoxicated on the 3rd day of July, 1983, and "I am further going to find that the State has proved by a preponderance of the evidence and by your stipulation that you were Forty-five Dollars delinquent in your probation fee payments as of the date of the filing of this Motion to Revoke Probation." Thereupon, the court revoked his probation and sentenced him to 60 days in the Orange County Jail.

At the sentencing the trial court stated that it was his understanding that the Appellant intended to give notice of appeal, which was confirmed by Appellant's counsel. The trial court then stated that it was not necessary for the Appellant to surrender his driver's license, pending the appeal.

■ The Appellant's sole ground of error is that the County Court at Law abused its discretion in revoking the Appellant's probation and sentencing him to 60 days in jail. From a careful reading of the

statement of facts, we think the trial judge carefully and conscientiously followed the evidence. He had the right and prerogative and, indeed, the duty to weigh the evidence and determine the credibility of the witnesses. In this, he has broad discretion. The trier of facts can believe or disbelieve any witness. He can believe part of a witness' testimony and reject other parts. We find that there is ample and sufficient evidence of probative force to support and sustain the order revoking probation. It was simply a fact question and the trier of facts decided against the Appellant.

■ There seems to be no contest concerning the revocation of probation based on delinquency in payment of probation fees. It is now well-established law that revoking of probation on one count alone will support that order. In the case of *Moore v. State*, 605 S.W.2d 924 (Tex.Crim. App.1980), we find the following holding at page 926:

"We need not address appellant's other contentions since one sufficient ground for revocation will support the court's order to revoke probation. *Jones v. State*, 571 S.W.2d 191 (Tex.Cr.App.1978). Nothing is presented for review."

*See also Gobell v. State*, 528 S.W.2d 223 (Tex.Crim.App.1975). We find no abuse of discretion below. Appellant's Ground of Error I is overruled. The judgment and sentence are affirmed.

AFFIRMED.